[Cite as *State v. Howard*, 2013-Ohio-1489.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | | CASE NO.   CA2012-04-034 |
| Plaintiff-Appellee, | : | |
| | | O P I N I O N |
| | : | 4/15/2013 |
| - vs - | | |
| | : | |
| JESSICA HOWARD, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 11CR27720


David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Thomas W. Kidd, P.O. Box 231, Harveysburg, Ohio 45032, for defendant-appellant


**S. POWELL, J.**

{¶ 1}   Defendant-appellant, Jessica Howard, appeals her convictions and sentence in the Warren County Common Pleas Court for trafficking in drugs and engaging in a pattern of corrupt activity.

{¶ 2}   In November 2009, appellant met Matt Geraci at a gym where they both exercised.  The couple began dating in February 2010 and, by April 2010, they were engaged to be married and were cohabiting at a home located on Marlette Drive in Hamilton

County, Ohio. At some point during this early stage of their relationship, appellant became aware that Geraci sold steroids as a main source of his income.

{¶ 3} Sometime in early 2011, the Warren County Drug Task Force (the "Drug Task Force") became aware of Geraci's illicit activities and, on June 21, 2011, executed several search warrants at the location of Geraci's drug operation at 10979 Reed Hartman Highway, as well as the home he shared with appellant. During the execution of the search warrants, detectives found over 200 vials of suspected anabolic steroids, drug paraphernalia, a multitude of packaging material, and large sums of money.

{¶ 4} Appellant and Geraci were interviewed several times after the June 21, 2011 search. After an initial investigation, appellant was indicted on one count of trafficking in drugs in violation of R.C. 2925.03(A)(2) and one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1). The trafficking in drugs charge carried enhancements specifying that the amount of drugs involved exceeded 50 times the bulk amount and that the trafficking occurred in the vicinity of a school. Appellant pled not guilty to both charges and a jury trial commenced on March 22, 2012.

{¶ 5} At trial, Geraci testified against appellant, stating that appellant learned he sold steroids "around February of 2010" when he "sat her down" in his Warren County condominium and discussed the operation with her. In April 2010, the couple moved into the Hamilton County residence, where Geraci sold steroids to anywhere from 15 to 20 individuals. Geraci explained that, after he was contacted by a "customer" for steroids, Geraci's "associate" would prepare the order, and then place the steroids inside a grill on the back patio of the residence. The customer would take the steroids from the grill and leave money, which Geraci would later retrieve.

{¶ 6} Around April 2011, Geraci testified that he moved the steroid operation to the CMC Office Center on Reed Hartman Highway in Blue Ash, Ohio in order to keep the

business away from his children.[1]  At the CMC Office Center, Geraci rented two offices, "Office C" and "Office F," which he used to organize and implement what he called the "locker system."  The "locker system" worked as follows: within Office F were a series of lockers with each of Geraci's distributors assigned to a locker.  A distributor would contact Geraci with an "order" of steroids.  The order would be prepared and placed in the appropriate locker.  The distributor would then collect the steroids and leave money in the locker for Geraci to collect at a later time.  Geraci also included invoices with the steroids so that each distributor knew how much money to leave.  The invoices would then be destroyed in a shredder located inside Office F.  The only steroids contained in Office F were inside the lockers and Geraci testified that only he and his distributors had the combinations to the lockers.  Geraci also stated that the door to Office F was locked by a key pad, to which appellant did not have the code.

{¶ 7}  Geraci testified that, to inform his distributors of how the locker system worked, he and appellant created signs with instructions that were hung throughout Office F.  Specifically, Geraci stated that appellant handwrote these signs per his instructions and, later, he printed copies off his computer and rehung the signs.  The signs included instructions to shred all invoices when finished for the day and code words to text Geraci when the transaction was completed or if only the drugs were being picked up without money being left.

{¶ 8}  Geraci then testified regarding Office C, the location where the steroids were stored before distribution.  Geraci stated that Office C's door contained a key lock, to which only he and his boss, Ron Herbort, had access but appellant did not.  Furthermore, within Office C was a file cabinet where the steroids were kept.  This file cabinet was also locked

---

1. Appellant was not the biological mother of these children.

with a key separate from the key used to open Office C's door. Geraci stated that appellant only had access to these keys when he gave them to her, which occurred rarely, including one occasion in May or June 2011.

{¶ 9} According to Geraci, Herbort did not trust Kris Scheid, the individual in charge of labeling and preparing the steroids for distribution. Therefore, Herbort instructed Geraci to supervise Scheid when he prepared the steroids. However, in May or June of 2011, Geraci was unable to supervise Scheid. Therefore, Geraci gave appellant the keys to access Office C and appellant supervised Scheid while he "label[ed] the bottles and count[ed] the pills" while in Office F. Though Geraci could not remember how the unlabeled steroids got into Office F, he testified that, when Scheid was finished labeling and preparing the steroids, appellant took them back to Office C and left them in the room.

{¶ 10} As to appellant's further involvement in his steroid operation, Geraci testified that, on another occasion, appellant retrieved envelopes from the lockers in Office F which contained money used to purchase steroids. Geraci also stated that, on four to five occasions, appellant would "double count" money for him that was collected from the lockers and used to purchase steroids. The money would then be placed in the couple's checking account and used to pay bills. On four to five occasions, appellant shipped steroids for Geraci through the mail and, at one point, appellant went to Walmart and used a fictitious name to pick up a money transfer from Herbort. In addition, Geraci testified that appellant drove a Volkswagen Bug that was acquired as payment for steroids. Finally, Geraci testified that appellant would often be present in her and Geraci's residence when steroid transactions would occur there. However, when asked directly, "[Appellant] was not involved in your business. * * * Is that correct?" Geraci answered "No."

{¶ 11} Detective John Wetzel, a police officer for the city of Lebanon and former detective for the Drug Task Force, testified regarding the June 21, 2011 execution of search

warrants on Offices C and F. Detective Wetzel stated that he was present when the search warrants were executed and that various syringes, vials containing liquids, and multiple pills were seized from inside Offices C and F. Detective Wetzel further testified that, during the execution of the search warrant on Office F, Scheid arrived with a bag full of approximately 120 vials of "suspected steroids." Detective Wetzel explained to the jury that the various syringes, vials, and pills were seized by the Drug Task Force and taken for testing.

{¶ 12} Kris Scheid then took the stand for the state, admitting that he knew Geraci and appellant because he bought and sold steroids from Geraci and worked for Geraci labeling and preparing steroids for distribution. Scheid testified that, in 2010, when the steroid operation was run out of Geraci and appellant's Hamilton County home, Scheid would go over to the house and purchase steroids face to face with Geraci. Specifically, Scheid stated that Geraci "would hand me the particular order, what I needed" and Scheid would hand money to Geraci. Scheid stated that, "two or three times," Geraci would not be at the house and he would "hand [appellant] the money" and he would take his order of steroids that "were right next to [appellant] on the desk."

{¶ 13} Scheid further testified that, eventually, Geraci offered him a job labeling bottles, which began in Geraci and appellant's basement but later occurred at the CMC Office Center. Scheid stated that, on June 1, 2011, he labeled packages in Office F while appellant supervised. Scheid explained that he and appellant arrived together and that the drugs were already located in his locker in Office F. Scheid labeled "little packages" of approximately 300 pill form "oral antibiotics" and then "handed them off to [appellant]" and left. The pills included a yellow pill called Winstrol and a white pill called Clenbuterol. Scheid further stated that Winstrol is a steroid but that Clenbuterol is used for asthma patients and is not a steroid but is used "in the body building realm" as a "fat burner." During the "couple of hours" that it took Scheid to label the packages, appellant worked on her own in-home

skincare business and did not participate in the labeling.

{¶ 14} Next, Joshua Haberstroh, another of Geraci's distributors, testified that he purchased steroids from Geraci beginning in late 2009. Haberstroh stated that he would, at times, physically hand money to appellant while in the office of Geraci and appellant's Hamilton County residence in order to pay for the steroids. Haberstroh stated that appellant never acted surprised when he paid her. However, Haberstroh further testified that he was not sure whether appellant knew why he paid her or the purpose of the money.

{¶ 15} Detective Dan Schweitzer, a member of the Drug Task Force, then testified regarding an interview he conducted with appellant on the day her and Geraci's residence was searched. Appellant told Detective Schweitzer she had been aware of Geraci's steroid operation since April 2010 and that she was familiar with steroids, knowing "what steroids were and what they looked like." Appellant also told the detective she was aware of Geraci's locker system and had accompanied Geraci to fill the lockers with steroids on many occasions, explaining that she and Geraci fill orders "basically once a day" almost every day of the year.[2] Appellant also told the detective that she had filled the lockers in the past, specifying that she "filled the top row of the lockers with the steroids." Appellant stated that she, personally, had never taken money out of the lockers but that Geraci would take the money out of the lockers and hand it to appellant for her to count. Detective Schweitzer also

---

2. Specifically, Detective Schweitzer stated as follows:

| STATE: | Did [appellant] ever indicate to you on how many times they would sell steroids, like was it every day, every month, once a year? |
|---|---|
| DET. SCHWEITZER: | I believe I recall that we asked her how many times a day do you fill orders or you and Geraci fill orders and she advised that we do it basically once a day, we don't do it multiple times in the day and then we asked her, how many days a week do you fill them and she's like, she's not sure and it kind of varies, but I believe that she said that they deal drugs or fill the orders, 345 days a year, as opposed to 365 days a year. |

testified that appellant was involved in shipping steroids approximately four times to Florida for Geraci and "picking up Western Union money orders." Appellant informed Detective Schweitzer that, on one occasion, she "picked up a money order for approximately $900 for Ron Herbort" from the "Meijers store" under the name "Margaret Jones." Appellant acknowledged that she knew her Volkswagen Bug was given to Geraci as payment for a steroid debt. Finally, appellant acknowledged to the detective that she had access to Office C and knew the keys to Office C and the filing cabinets therein were located "upstairs in their bedroom."

{¶ 16} During the interview, Detective Schweitzer also showed appellant photographs dated June 1, 2011 of her and Scheid outside the CMC Office Center.[3] According to Detective Schweitzer, the photographs depicted appellant holding a bag in her hand and appellant stated that the bag contained "between four and five hundred bottles of steroids." Appellant explained that "she was there on that date to basically watch [Scheid] to make sure that he didn't steal any of the bottles of steroids, while he labeled them." Appellant stated that she had supervised Scheid on two occasions and that she would take the labeled steroids out of Office F and return them to Office C when Scheid was finished.

{¶ 17} Detective Bill Couch was the last detective for the Drug Task Force to testify for the state. Detective Couch provided surveillance for a number of controlled drug buys between confidential informants and Geraci and his distributors. Detective Couch testified regarding the layout of the CMC Office Center, Offices F and C, and their location to a nearby "kindergarten daycare center." Specifically, Detective Couch stated that a kindergarten/day-care center is located to the west of the CMC Office Center and estimated

---

3. These photographs were not admitted into evidence as they were not disclosed by the state during discovery. However, Detective Schweitzer's testimony regarding the photographs was permitted over objection by defense counsel.

that Office C was within 100 feet of the kindergarten/day-care center while Office F was "probably 150 maybe, 175 feet" away from the kindergarten/day-care center. Detective Couch stated that, while conducting surveillance on the CMC Office Center, he and other officers were able to observe and photograph children entering and exiting the kindergarten/day-care center and playing in the adjacent play yard.

{¶ 18} Detective Couch then testified regarding an interview he conducted with Geraci and appellant two days after the June 21, 2011 execution of the search warrants. Both Geraci and appellant wanted to know how they could cooperate with the police in order to help themselves. During the interview, appellant never denied her mutual involvement in the steroid operation.

{¶ 19} Brooke J. Ehlers, a forensic chemist with the Miami Valley Crime Laboratory, also testified at trial. Ehlers stated that she had experience testing steroids and explained the procedure she uses for testing steroids, which she described as a Schedule III controlled substance. Ehlers testified that the bulk amount for a Schedule III drug in liquid form is 16 milliliters (mL) and in pill form is 200 unit doses. Ehlers also testified to her knowledge of Winstrol, explaining that it is "a brand name for a Schedule III controlled substance" and usually "contains a steroid called Stanozolol." Ehlers confirmed that Clenbuterol is not a steroid "but has been banned by the FDA."

{¶ 20} As to the substances found in Offices C and F, Ehlers testified that she received 269 vials totaling 2,144 mL of liquid for analysis, but that she did not analyze any pills. Ehlers tested a number of the vials and her analysis revealed the following:

| EXHIBIT | DESCRIPTION | VIALS COLLECTED | VIALS TESTED |
|---|---|---|---|
| 2 | Vials purchased from Geraci at location off Escort Drive in Mason, Ohio. | 8 vials (79.5 mL) | 4 Vials Trenbolone Enanthate (43.5mL)<br><br>2 Vials Testosterone Enanthate (18mL)<br><br>2 Vials Testosterone Proprionate (18mL) |
| 96 | Vials purchased by Tina Riffenberger from Josh Haberstroh off Deerfield Blvd (1/12/2011) | 8 vials (69.5 mL) | 4 Vials Nadrolone Decanoate (34mL)<br><br>1 Vial Testosterone Enanthate / Testosterone Cypionate (8.5mL)<br><br>3 Vials Testosterone Cypionate / Testosterone Propionate (26 mL) |
| 98 | Vials purchased by Tina Riffenberger from Josh Haberstroh off Kings Auto Mall Road (3/9/2011) | 8 vials (36 mL) | 4 Vials Testosterone Proprionate (36mL)<br><br>4 Vials did not contain steroids |
| 101 & 102 | Vials seized from Kris Scheid off Reed Hartman Highway (6/21/2011). | 109 vials (872 mL) | 2 Vials Testosterone Enanthate / Testosterone Propionate (16-18mL)<br><br>(Remaining 107 vials not tested) |
| 66 | Vials found inside an envelope in the file cabinet contained inside Office C. | 28 vials (244 mL) | 1 Vial Testosterone Enanthate / Testosterone Proprionate (8-9mL)<br><br>(Remaining 27 vials not tested) |
| 73 | Vials found inside an envelope in the file cabinet contained inside Office C. | 67 vials (536mL) | 1 Vial Nandrolone Decanoate (8-9mL)<br><br>(Remaining 66 vials not tested) |
| 77 | Vials found inside an envelope in the file cabinet contained inside Office C. | 41 vials (328mL) | 1 Vial Nadrolone Propionate / Testosterone Propionate (8-9mL)<br><br>(Remaining 40 vials not tested) |

{¶ 21} Finally, appellant testified on her own behalf. Appellant admitted that she knew Geraci was selling steroids as early as April 2010. Appellant further stated that men would often walk into her and Geraci's Hamilton County residence unannounced and go "do business" with Geraci in his home office. Appellant denied that any of these men ever conducted business with her including handing her money. She further denied that she (1) placed steroids or retrieved money from the grill on the back patio; (2) packaged or labeled steroids in her residence; (3) shipped steroids to Florida for Geraci; or (5) had access to Offices C and F. In addition, appellant specifically stated that she was in no way a part of Geraci's "business enterprise."

{¶ 22} However, appellant admitted to supervising Scheid's labeling of steroids on June 1, 2011 under Geraci's orders. Appellant explained that Geraci was unavailable to supervise Scheid that day and, therefore, he instructed appellant to make sure Scheid did not steal anything. Appellant denied ever touching the steroids or being involved in the labeling that day.

{¶ 23} Regarding her relationship with Geraci, appellant stated that he was "very controlling" and that she had "not made a decision on [her] own in the last year and a half." She stated that Geraci had threatened her in the past and that, on one occasion, he stated that if she left him, he would kill her. Appellant also explained that Geraci was "in and out constantly" and "out at all times of the night" without informing appellant where he was going. However, Geraci would "check up" on appellant, she would "constantly get phone calls from him and he would randomly stop in." According to appellant, Geraci was "consumed 24/7 by his business" and would tell her things about the business so that, "if he was ever in trouble, [appellant] could be in that position as well."

{¶ 24} However, the jury was later instructed to "disregard all of the testimony where [appellant] claims she was threatened." The trial court determined that, as appellant failed to

"admit that she committed the crime," appellant was not entitled to assert a defense of duress.

{¶ 25} The jury ultimately found appellant guilty of both trafficking in drugs and engaging in a pattern of corrupt activity. The jury further found that both the bulk enhancement specification and the vicinity of a school enhancement specification applied in this case. Appellant was sentenced to serve five years in prison for each offense with the sentences to run concurrently.

{¶ 26} Appeal now appeals, raising two assignments of error:

{¶ 27} Assignment of Error No. 1:

{¶ 28} THE TRIAL COURT ERRED IN DENYING [APPELLANT] A JURY INSTRUCTION FOR DURESS ON THE BASIS THAT SHE HAD NOT ADMITTED GUILT TO THE CRIMES SHE WAS CHARGED.

{¶ 29} In her first assignment of error, appellant contends that the trial court erred in failing to instruct the jury on the affirmative defense of duress. The trial court refused to give the duress instruction on the basis that appellant had not admitted guilt to the crimes. Appellant contends, however, that she admitted *involvement* in the crimes, which is all that is required. In addition, appellant contends that sufficient evidence was brought forth at trial to prove the affirmative defense of duress by a preponderance of the evidence and, therefore, the trial court's error was not harmless.

{¶ 30} It is within the discretion of the trial court to determine whether the evidence presented at trial is sufficient to require a particular jury instruction. *State v. Hall*, 12th Dist. No. CA2007-02-005, 2008-Ohio-1889, ¶ 63; *State v. Tucker*, 12th Dist. No. CA2010-10-263, 2012-Ohio-139, ¶ 23. Here, there is no evidence in the record that appellant requested an

instruction for duress before the jury retired.[4] Thus, appellant has waived any claim of error regarding the instruction absent plain error. Crim.R. 30(A); Crim.R. 52(B); *State v. Williford*, 49 Ohio St.3d 247, 251 (1990). To constitute plain error, the error (1) must be a deviation from the legal rule, (2) must be an obvious defect in the trial proceedings, and (3) must have affected the defendant's substantial rights. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16; *State v. Dominguez*, 12th Dist. No. CA2011-09-010, 2012-Ohio-4542, ¶ 26. "Plain error does not exist unless the appellant can establish that the outcome of the trial would have been different but for the trial court's allegedly improper action." *Payne* at ¶ 17; *Dominguez* at ¶ 26; *State v. Waddell*, 75 Ohio St.3d 163, 166, 1996-Ohio-100. "Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus; *State v. Phillips*, 74 Ohio St.3d 72, 83, 1995-Ohio-171.

**{¶ 31}** "Duress is an affirmative defense to a criminal charge." *Hall* at ¶ 61. A criminal defendant is entitled to an instruction on the affirmative defense of duress if the defendant proves by a preponderance of the evidence that she acted under duress or coercion. *State v. Bishop*, 12th Dist. No. CA97-07-032, 1998 WL 684486, *6 (Oct. 5, 1998), citing R.C. 2901.05(A); *Hall* at ¶ 62. A defendant is said to be under duress when he or she is compelled to commit a crime by another under threat of imminent death or serious bodily injury, and the force compelling the defendant remains constant, controlling the will of the unwilling defendant during the entire time he or she commits the act, and is of such a nature that he or she cannot safely withdraw. *Hall* at ¶ 61. "In the usual case, duress can be

---

4. It appears that conversations took place between the trial court, the state, and defense counsel off the record, presumably regarding a duress jury instruction. However, as these conversations are not a part of the record, we cannot be sure what occurred. As this court must base its decisions upon only that information that is found in the record, we must apply a plain error analysis. *See State v. Gaines*, 12th Dist. No. CA99-04-082, 2000 WL 433235, * 5 (April 17, 2000) ("our review is limited to the trial court record").

effectively shown only by the defendant testifying as to the fear or force which compelled him to act." *Bishop* at *6. Furthermore, "in order to assert a defense of duress, one must logically admit involvement in the crimes charged[.]" *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 193; *Hall* at ¶ 65.

{¶ 32} In this case, appellant, on direct examination, testified that Geraci had threatened her in the past and that, on one occasion, stated he would kill her if she ever left him. Appellant further testified that Geraci was "very controlling" and would check up on her through phone calls and by "randomly stop[ping] in."

{¶ 33} In addition, appellant admitted that she had supervised Scheid while he labeled steroids and that Geraci had not been present that day. Appellant further admitted to picking up a Western Union money order from Ron Herbort. Importantly, however, at the conclusion of her direct examination, the following exchange took place:

| DEFENSE: | Jessica, did you do the things that they're accusing you of doing? |
|---|---|
| APPELLANT: | No. |
| DEFENSE: | Did you participate in the steroid/Geraci enterprise? |
| APPELLANT: | No. |
| DEFENSE: | Were you a vital person in this ring of business men? |
| APPELLANT: | No, I was a mother. |

{¶ 34} It was within the discretion of the trial court to determine whether sufficient evidence was presented to require an instruction on the affirmative defense of duress. Based upon our review of the record, appellant's testimony regarding her involvement in the crime was contradictory at best, as she admitted to supervising Scheid but stated that she never touched the drugs and did not participate in the steroid operation.

{¶ 35} Moreover, even if appellant admitted to her involvement in the crime, she failed to satisfy the elements that an immediate and continuous threat of violence was upon her from which she could not safely withdraw. Though appellant testified that Geraci threatened her, this threat had no relation to the steroid operation. In addition, Geraci was not present during the only illicit conduct appellant admitted to—supervising Scheid—and, therefore, appellant fails to demonstrate how she could not have safely withdrawn.

{¶ 36} Thus, we find that the trial court did not err in refusing to instruct the jury on the affirmative defense of duress and that the outcome of the trial would not have been different had the jury instruction been given. Accordingly, appellant's first assignment of error is overruled.

{¶ 37} Assignment of Error No. 2:

{¶ 38} THE CONVICTIONS AS RELATED TO THE ENHANCEMENT FOR DRUG TRAFFICKING AND ENGAGING IN A PATTERN OF CORRUPT ACTIVITY WITHIN THE VICINITY OF A SCHOOL AND THE ENHANCEMENT FOR AN AMOUNT EXCEEDING FIFTY TIMES THE BULK ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WERE NOT PROVEN BY A SUFFICIENCY OF THE EVIDENCE.[5]

{¶ 39} In her second assignment of error, appellant challenges the enhancements placed upon her conviction for drug trafficking with an amount of illegal drugs exceeding 50 times the bulk amount ("bulk amount enhancement") and for committing that crime within the vicinity of a school ("school enhancement") as not sufficiently supported by the evidence and against the manifest weight of the evidence.

{¶ 40} When reviewing the sufficiency of the evidence underlying a criminal conviction,

---

5. At oral argument, counsel for appellant argued generally that appellant's convictions were against the manifest weight of the evidence and not supported by sufficient evidence. Additionally, counsel for appellant raised the issue of venue for the first time. However, as those arguments were not specifically raised as assignments of error or discussed in the brief, this court declines to consider the merits of such arguments. *See* App.R. 12.

the function of an appellate court is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 41} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *State v. Wilson*, 12th Dist. No. CA2006-01-007, 2007-Ohio-2298, ¶ 34. In determining whether the conviction is against the manifest weight of the evidence, an appellate court "must weigh the evidence and all reasonable inferences from it, consider the credibility of the witnesses and determine whether in resolving conflicts, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Coldiron,* 12th Dist. Nos. CA2003-09-078, CA2003-09-079, 2004-Ohio-5651, ¶ 24; *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. "This discretionary power should be exercised only in the exceptional case where the evidence weighs heavily against conviction." *Id*.

{¶ 42} In this case, appellant failed to challenge the bulk amount and school enhancements on cross-examination, through motion, or through a proposed jury instruction. In short, the issue was never brought to the trial court's attention. As such, our review of appellant's arguments is limited to a plain error analysis. *See State v. Manley*, 71 Ohio St.3d 342, 347 (1994).

{¶ 43} "Pursuant to the terms of Crim.R. 52(B), plain errors or defects which affect substantial rights may be grounds for reversal even though they were not brought to the

attention of the trial court." *Id.* As stated above, to constitute plain error, "the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection." *Dominguez*, 2012-Ohio-4542 at ¶ 26.

### Bulk Amount Enhancement

**{¶ 44}** As to the bulk amount enhancement, appellant contends that the state failed to sufficiently prove the identity, weight, and dosage of the drugs appellant allegedly trafficked in on June 1, 2011. Specifically, appellant argues that, while the state can connect appellant to images taken June 1, 2011 involving steroids in pill form, the state failed to put forth any evidence that appellant was involved with the liquid steroids introduced at trial or that the pills involved included steroids in bulk amount. Essentially, appellant argues that her conviction for drug trafficking is against the manifest weight of the evidence and not supported by sufficient evidence because (1) she was not in possession of liquid steroids on June 1, 2011, and (2) there is no evidence that the steroids she did possess on June 1, 2011 exceeded 50 times the bulk amount.

**{¶ 45}** Appellant was found guilty of trafficking in drugs in violation of R.C. 2925.03(A)(2), which provides that no person shall knowingly "prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance * * * when the offender knows or has reasonable cause to believe that the controlled substance * * * is intended for sale or resale by the offender or another person." Generally, drug trafficking is a felony of the fifth degree. R.C. 2925.03(C)(2). However, R.C. 2925.03(C)(2)(e) states that drug trafficking is a felony of the second degree if the amount involved equals or exceeds 50 times the bulk amount.[6] R.C. 2925.01(D)(5) defines "bulk amount" as "[a]n amount equal to or exceeding two hundred solid dosage units, sixteen grams, or sixteen milliliters of a

---

6. In this case, appellant's conviction was further elevated to a felony of the first degree because the drug offense allegedly occurred within the vicinity of a school.

compound, mixture, preparation, or substance that is or contains any amount of a schedule III anabolic steroid."

{¶ 46} While the definition of "bulk amount" is a matter of law, the questions of whether a substance seized from an accused is a drug of abuse and whether it exceeds the bulk amount are questions of fact. *State v. Montgomery*, 17 Ohio App.3d 258, 260 (1st Dist.1984). Thus, the trier of fact must be convinced that the evidence has established beyond a reasonable doubt the identity and weight of a Schedule III anabolic steroid before the defendant can be found guilty. *See id.*

{¶ 47} In support of its contention that appellant trafficked in drugs on June 1, 2011, the state produced the testimony of Scheid, who stated that appellant supervised his labeling and preparation of drugs for distribution on that date. Scheid further testified that the types of drugs being handled that day were Winstrol and Clenbuterol, both in pill form. Appellant estimated that Scheid labeled 400-500 bottles of steroids that day. Additionally, Geraci and Detective Schweitzer testified that, after Scheid finished labeling the Winstrol and Clenbuterol, appellant carried the pills to Office C and placed the pills in the room. In fact, appellant testified that Scheid "just handed me a bag and I walked up the stairs and [Geraci] told me to take whatever was given to me and put it on the floor in [Office C.]"

{¶ 48} However, this is not the only testimony presented at trial which indicated appellant had access to the voluminous amounts of steroids involved in this case. Detective Schweitzer and Geraci also testified that appellant had shipped at least four packages of steroids to Florida for Geraci. Geraci further testified that appellant often went with him to the CMC Office Center and Detective Schweitzer testified that appellant told him she had personally stocked the top row of lockers in Office F with steroids and that she had knowledge of the entire steroid operation, including the fact that the steroids in the lockers would be used for personal use as well as for resale.

{¶ 49} All of the above events occurred between the moving of the steroid operation to the CMC Office Center in April 2011, and the execution of the search warrants on June 21, 2011. Finally, Ehlers, the forensic chemist who tested the vials found at the CMC Office Center, testified that the majority of the vials found in Offices C and F contained schedule III steroids.

{¶ 50} Thus, competent, credible evidence was presented to the jury that, *on or about* June 1, 2011, appellant knowingly prepared for shipment, shipped, transported, delivered, prepared for distribution, or distributed anabolic steroids knowing or with reasonable cause to believe that the intent was to sell or resell the anabolic steroids.

{¶ 51} In addition, there was competent, credible evidence that the amount of steroids involved exceeded 50 times the bulk amount, or 800mL. From the evidence presented at trial, appellant can be linked only to those vials of steroids found within Offices C and F on June 21, 2011, which include state's exhibits 66, 73, and 77.[7] Those exhibits contained 136 vials and 1,108mL of steroids. As such, appellant can be linked to over 800mL of steroids. Therefore, her conviction and bulk amount enhancement were not against the manifest weight of the evidence and, consequently, were supported by sufficient evidence.

### Vicinity of a School Enhancement

{¶ 52} As to the school enhancement, appellant contends that (1) the state failed to put forth credible evidence that appellant's offenses were, in fact, committed within 1,000 feet of a school; (2) the state failed to established that the kindergarten/daycare center constitutes a school pursuant to R.C. 2925.01(Q); and (3) the trial court failed to instruct the jury on the definition of a school pursuant to R.C. 2925.01(Q).

---

7. Geraci testified that appellant had nothing to do with state's exhibit 2, the eight vials purchased from him off Escort Drive in Mason, Ohio. Furthermore, there was no testimony linking appellant to the vials of steroids purchased on January 12, 2011 and March 9, 2011 involving Haberstroh and Tina Riffenberger.

{¶ 53} As previously indicated, appellant was found guilty of trafficking in drugs in violation of R.C. 2925.03(A)(2), which provides that no person shall knowingly "prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance * * * when the offender knows or has reasonable cause to believe that the controlled substance * * * is intended for sale or resale by the offender or another person." This offense allows for the enhancement of the specified felony level if the offense occurs in the vicinity of a school. *See* R.C. 2925.03(C)(2)(e) (Trafficking in drugs is a felony of the first degree where the amount of drug involved equals or exceeds 50 times the bulk amount and the offense occurred in the vicinity of a school).

{¶ 54} An offense is committed in the vicinity of a school when the offense is committed "within one thousand feet of the boundaries of any school premises[.]" R.C. 2925.01(P); *State v. McCree*, 12th Dist. Nos. CA2010-02-029, CA2010-02-030, 2011-Ohio-1993, ¶ 28. "School premises" is defined by R.C. 2925.01(R) to include either of the following:

> (1) The parcel of real property on which any school is situated, whether or not any instruction, extracurricular activities, or training provided by the school is being conducted on the premises at the time a criminal offense is committed;
>
> (2) Any other parcel of real property that is owned or leased by a board of education of a school or the governing body of a school for which the state board of education prescribes minimum standards under [R.C. 3301.07] and on which some of the instruction, extracurricular activities, or training of the school is conducted, whether or not any instruction, extracurricular activities, or training provided by the school is being conducted on the parcel of real property at the time a criminal offense is committed.

"School," as used in defining "school premises," is defined as:

> [A]ny school operated by a board of education, any community school established under [R.C. Chapter 3314], or any nonpublic school for which the state board of education prescribes

minimum standards under [R.C. 3301.07], whether or not any instruction, extracurricular activities, or training provided by the school is being conducted at the time a criminal offense is committed.

R.C. 2925.01(Q).

{¶ 55} The school enhancement specification increases the felony level for the offense and must be separately established beyond a reasonable doubt. *State v. Boyd*, 6th Dist. No. OT-06-034, 2008-Ohio-1129, ¶ 40, citing *State v. Manley*, 71 Ohio St.3d 342, 346 (1994). As such, it is "an essential element of the state's case-in-chief." *Id.* The intent behind the school enhancement specification is "to punish more severely those who engage in the sale of illegal drugs in the vicinity of our schools and our children." *Manley* at 346; *Boyd* at ¶ 46. "Laxness in proof that an illegal drug sale occurred in the vicinity of a school for minor children—as opposed to a vacant school building or a post-secondary welding school—results in defendants receiving enhanced penalties contrary to the purpose of the law." *Boyd* at ¶ 46; *State v. Darling*, 8th Dist. No. 92120, 2009-Ohio-4198, ¶ 20.

Kindergarten/Day-care Constituting School

{¶ 56} Appellant first contends that the state failed to present sufficient evidence that the kindergarten/day-care center testified to by Detective Couch satisfies the definition of "school" pursuant to R.C. 2925.01(Q) and (R). Within this argument, appellant additionally asserts that the trial court committed plain error in not instructing the jury on the definition of "school."

{¶ 57} In 1994, the Ohio Supreme Court addressed the very issue before us today, where a defendant was convicted of drug trafficking in the vicinity of the school and challenged for the first time on appeal the school enhancement specification. *Manley*, 71 Ohio St.3d 342. In *Manley*, two police officers and a police informant testified that the drug transaction at issue took place in close proximity to "the Whittier School," with one witness

measuring the distance at 250.3 feet. *Id.* at 346. No testimony was elicited as to whether the Whittier School satisfied the definition of school under R.C. 2925.01(Q) and (R), no instruction regarding the definition of school was provided to the jury, and the defendant failed to make any challenge regarding the school enhancement to the trial court. *Id.*

**{¶ 58}** On appeal, the court of appeals reversed the defendant's sentence under the school enhancement based, in part, on the trial court's failure to provide the jury with a specific definition of school. *Id.* at 347. However, on further appeal, the Ohio Supreme Court found that "a trial court's failure to separately and specifically charge a jury as to each element of an offense does not *per se* constitute plain error." (Emphasis sic.) *Id.* The Ohio Supreme Court further determined that "affirmative proof that a board of education operated the premises" is not necessary to prove beyond a reasonable doubt that the offense was committed in the vicinity of a school. *Id.* at 347-348. Rather, the Court determined that circumstantial evidence may be just as effective in proving the existence of a school as direct evidence. *Id.* at 348. As three witnesses testified that the drug transaction occurred within the immediate vicinity of a school, and the issue of whether the Whittier School met the definition of school under R.C. 2925.01(Q) and (R) was not challenged at the trial court level, the Ohio Supreme Court determined that, in viewing the evidence in a light most favorable to the prosecution, plain error did not occur as the outcome of the trial would not clearly have been otherwise. *Id.*

**{¶ 59}** Since *Manley*, several courts have addressed the type of evidence sufficient to prove the school enhancement specification. For example, in *State v. Cates*, 10th Dist. No. 00AP-73, 2000 WL 1724870 (Nov. 21, 2000), the Tenth Appellate District sustained a school enhancement penalty as supported by sufficient evidence where two officers testified that the offense occurred in the vicinity of "Douglas Elementary." *Id.* at * 2. The Tenth District determined that this testimony sufficiently showed the existence of a school as defined in the

statute. The Eleventh District in *State v. Speers*, 11th Dist. No. 2003-A-0112, 2005-Ohio-4654, also followed this logic.

{¶ 60} In *State v. McDuffey*, 3rd Dist. No. 13-03-41, 2003-Ohio-6985, the Third Appellate District applied *Manley* and determined that, since the school at issue was referred to by name, "St. Wendeline Elementary School," the testimony at trial, "when viewed in a light most favorable to the prosecution, provided sufficient evidence for a rational trier of fact to have found this essential element of the crime proven beyond a reasonable doubt." *Id.* at ¶ 8.

{¶ 61} The Fourth Appellate District, in *State v. Throckmorton*, 4th Dist. No. 08CA17, 2009-Ohio-5344, *reversed on other grounds*, *State v. Throckmorton*, 126 Ohio St.3d 55, 2010-Ohio-2693, also strictly adhered to the Ohio Supreme Court's decision in *Manley*. In *Throckmorton*, several witnesses testified that the defendant committed drug offenses in the vicinity of a school. The Fourth District chose to follow the "caution" expressly stated by *Manley* that courts should not read R.C. 2925.01(Q) and (R) "so rigidly as to preclude a conviction when the facts clearly demonstrate that the offense occurred 'in the vicinity of a school.'" *Id.* at ¶ 37. To do so would leave the statute's purpose—to punish more severely those who commit offenses in the vicinity of a school—unfulfilled. *Id.* at ¶ 39. The court then pointed out that "no one seriously challenge[d] whether the premises were school premises" and the defendant's counsel implied, at a bench conference, that he did not question whether the building at issue was actually a school but only whether the state had produced a witness to "utter the magic words contained in the statute." *Id.* at ¶ 37-39.

{¶ 62} The Eighth Appellate District also chose to apply *Manley* strictly. *State v. Manlet*, 8th Dist. No. 93309, 2010-Ohio-3503. In *Manlet*, a narcotics detective testified that the location of several drug transactions occurred "a stone's throw" away from "a licensed day care" called "Faith Presbyterian Head Start Day Care." *Id.* at ¶ 31. When questioned by

the prosecutor, the detective stated that the day-care was "state certified," although no supporting evidence was provided on this point. *Id.* at ¶ 32. The defendant did not challenge the detective's testimony as to the existence of the daycare. *Id.* at ¶ 33. The Eighth District determined that, although there was little indication that the facility was a school as defined in R.C. 2925.01(Q), the facts of the case were directly on point with *Manley*. *Id.* at ¶ 37.

{¶ 63} In *State v. Shaw*, 7th Dist. No. 03 JE 14, 2004-Ohio-5121, on the other hand, the Seventh Appellate District vacated a school enhancement penalty on the basis of insufficient evidence. In *Shaw*, officers witnessed the defendant throw a baggie of crack cocaine out of a vehicle while within 1,000 feet of "Wells school." *Id.* at ¶ 2. Several witnesses and counsel for both parties referred to the building as "Wells school" and the trial judge attempted to take judicial notice of the fact that "everybody in Jefferson County" knows that "Wells school" is a school. *Id.* at ¶ 43. Defense counsel cross-examined the witnesses regarding whether the school was run by a school board and the trial court instructed the jury on the definitions of "school," "school premises," and "school building" as defined in R.C. 2925.01. *Id.* at ¶ 45-47. However, the Seventh District determined that the prosecution failed to prove the school enhancement specification beyond a reasonable doubt. *Id.* at ¶ 57. The court pointed out that "[n]o witness actually testified that [the defendant's] drug offenses occurred within one thousand feet of an actual school" and that "each witness assumed the existence of an operational school at [that] location." *Id.* at ¶ 56. The Seventh District found that "merely calling the building 'Wells school' does not rise to the level required to prove its existence." *Id.* The court then vacated the school specification enhancement penalty and remanded the case for resentencing. *Id.* at 57.

{¶ 64} Similarly, in *State v. Boyd*, 2008-Ohio-1129, the Sixth Appellate District determined that the testimony elicited by one detective was not sufficient to establish the existence of a school within the vicinity of the drug transaction. In *Boyd*, a drug task force

detective who supervised "controlled buys" between the defendant and a confidential informant testified that the location where the buys occurred was 264 feet from "school property." *Id.* at ¶ 13. During his testimony, the detective never stated the name of the school or described the type of school and no other evidence was presented regarding the school. *Id.* at ¶ 48. The Sixth District determined that it could not "assume the existence of sufficient evidence to support an essential element of the state's case-in-chief." *Id.* As the state presented insufficient evidence on its burden of proof, the Sixth District determined that "the failure to instruct the jury that a 'school' must meet the definition of R.C. 2923.01 is plain error." *Id.* The Sixth District then reversed and vacated the defendant's school enhancement specifications. *Id.* at ¶ 50.

{¶ 65} In the case before us, only one witness testified to the existence of a kindergarten/day-care center within 1,000 feet of the CMC Office Center where the drug transactions would occur. Detective Couch testified that Offices C and F were within 200 feet of a "kindergarten daycare center" and that, "on many occasions, myself and whoever I was with, when a drug transaction took place, we would take pictures of the kids either coming into the building, leaving the building or playing out in the play yard." Though Detective Couch never referred to the building specifically as a "school," the term "kindergarten" is defined as "a school or division of a school below the first grade." Webster's Third New International Dictionary (1993) 1243. In addition, R.C. Chapter 3114—used in the definition of school under R.C. 2925.01(Q)—utilizes the term "kindergarten" in discussing community schools. *See* R.C. 3114.08 ("The state board of education shall adopt rules requiring * * * a local school district to annually report * * * the number of students entitled to attend school in the district who are enrolled in kindergarten in a community school"). Finally, Detective Couch testified that children could be seen entering, exiting, and playing around the building, thereby indicating that the building was currently being used as a kindergarten/day-care

center.

**{¶ 66}** Based upon our review of the record and the numerous cases on point, we follow with the logic of the Ohio Supreme Court and the Third, Fourth, Eighth, Tenth, and Eleventh Districts. We find that circumstantial evidence may be used to prove that a building falls under the definition of "school" required by R.C. 2925.01(Q). We further find, in viewing the evidence in a light most favorable to the prosecution, that sufficient evidence was produced at trial to support the school enhancement specification, that the jury did not lose its way in convicting appellant of the school enhancement, and that the trial court did not commit plain error in failing to instruct the jury on the definition of "school" pursuant to R.C. 2925.01(Q). Although the state could have presented clearer evidence of the existence of the school including, for example, the name of the school, the state met its burden of establishing the existence of a school beyond a reasonable doubt. To hold otherwise would leave the purpose of the statute—to punish more severely those who commit offenses in the vicinity of a school—unfulfilled. *Manley* at 346

## Distance from School.

**{¶ 67}** Appellant additionally argues that the state failed to provide sufficient evidence that the drug transaction took place within 1,000 feet of a school. Specifically, appellant contends that Detective Couch's "estimations" and "assumptions" that the kindergarten/daycare center was within 200 feet of both Offices C and F were insufficient to support the school enhancement specification.

**{¶ 68}** In support of this contention, appellant cites *State v. Olvera*, 6th Dist. Nos. WM-98-022, WM-98-023, 1999 WL 819346 (Oct. 15, 1999), where the Sixth District determined that the testimony of one police officer that the drug transactions occurred "709 feet" from the front step of a middle school was insufficient to support a school enhancement. *Id.* at * 9. The court in *Olvera* stated that the police officer failed to explain how he ascertained the

distance, that it was unclear whether the exhibit used by the officer to diagram the distance was drawn to scale, and that the diagram was not made part of the trial court's record. *Id.*

{¶ 69} Although *Olvera* supports appellant's contention, more recent Ohio cases have held that a witness's approximation that the distance between a drug transaction and a school is 1,000 feet is sufficient to uphold a defendant's conviction and not against the manifest weight of the evidence. *State v. Throckmorton*, 2009-Ohio-5344 at ¶ 36 (testimony that the drug offenses occurred "close to the school," with supporting photographic evidence, is sufficient evidence to support school specification enhancement); *State v. Brown*, 9th Dist. No. 23637, 2008-Ohio-2670, ¶ 18 (conviction supported by the evidence where evidence, including photographs, demonstrated that drug transaction occurred in a house directly across the street from school); *State v. Speers*, 2005-Ohio-4654 at ¶ 34 (conviction and enhancement not against the manifest weight of the evidence where two detectives testified that they visually observed the distance to be around 400 feet and that the drug transactions occurred on the "same city block" and the "property lot adjacent to the elementary school"); *State v. Cates*, 2000 WL 1724870 at *2 (approximating the distance between drug transaction and school and measuring the distance between a drug transaction and school by driving in car is sufficient to support jury conviction and enhancement); *but see State v. Goins*, 5th Dist. No. CA99-08, 2000 WL 1523159 (Sept. 29, 2000) (state failed to present sufficient evidence to prove school specification enhancement where a laser speed control was used to measure the distance, "as the crow flies," between a drug transaction and school but did not consider a ravine which separated the drug transaction location and the school).

{¶ 70} In this case, Detective Couch estimated that that Office C was 100 feet away from the kindergarten/day-care center and Office F was 150-175 feet away. Based upon this evidence, we agree with the above line of cases that a witness' approximation of the distance

between a drug transaction and a school is sufficient to uphold a school specification enhancement. As such, we find that the state presented sufficient evidence to support the school specification enhancement and the jury did not lose its way and create a manifest miscarriage of justice in finding that appellant's offenses occurred within 1,000 feet of a school. The state presented sufficient evidence to support appellant's school enhancement specification.

{¶ 71} Accordingly, appellant's second assignment of error as to the school enhancement is overruled.

{¶ 72} Judgment affirmed.

HENDRICKSON, P.J., and RINGLAND, J., concur.